# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER  09-0238** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **JOSE LUIS VICUNA** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 21] filed by defendant Jose Luis Vicuna.  For reasons stated below, it is recommended that the motion be **DENIED.**

On August 24, 2009, Louisiana State Police Trooper Bruce Robinson (sometimes referred to as "Robinson"), stopped Jose Luis Vicuna ("Vicuna") for a traffic violation on Interstate 20 in Lincoln Parish, Louisiana.  Pursuant to the stop, the Louisiana State Police ultimately uncovered packages of cocaine located inside of a hidden compartment in Vicuna's pickup truck.  On September 25, 2009, a federal grand jury returned an indictment against Vicuna for his alleged knowing and intentional possession with intent to distribute five kilograms or more of cocaine powder in violation of 21 U.S.C. § 841(a)(1).  On November 13, 2009, Vicuna, via counsel, filed the instant motion to suppress all of the evidence that was seized as a result of the stop and search of his truck.  Following a delay for briefing and an evidentiary hearing that was held on January 22, 2010, the matter is now before the court.[1]

---

[1]  Following the hearing, the court granted the government's request for an additional two week delay to submit a supplemental brief.  This period has since lapsed, and neither side has filed a supplemental brief.

**Background**

The following facts were established via the testimony and evidence presented at the January 22, 2010, hearing held in this matter.[2]

During the relevant period, Troopers Bruce Robinson and Michael Linton were members of the Louisiana State Police criminal interdiction unit, which is charged with patrolling the highways for any type of criminal activity.  Trooper Robinson is a 16 year veteran with the Louisiana State Police.  Prior to that, he worked for four years with the Ouachita Parish Sheriff.  Over the years, Robinson has been involved in at least 100 narcotics related traffic stops.  Trooper Linton has been associated with the Louisiana State Police for the past 12 ½ years and employed as a trooper for the past eight years.  Over the years, Trooper Linton has been involved in thousands of traffic stops, of which, approximately 50 resulted in the discovery of illicit drugs.

In the late afternoon/early evening on August 24, 2009,[3] Troopers Robinson and Linton were conducting a stationary patrol in the median of I-20 at mile marker 85 in Lincoln Parish, Louisiana,[4] when Robinson observed an early 90's blue Chevrolet pickup truck stray halfway onto the shoulder, and heard  the truck's tires run over the "rumble strips" that mark the edge of the lane.[5]  Trooper Linton, who was seated in his unit parked next to Robinson, also heard the

---

[2]  One of the exhibits introduced into evidence was a contemporaneous video and audio recording of the traffic stop captured by a dash-mounted camera in Trooper Robinson's patrol car or "unit."  The associated audio feed was captured by a microphone that was affixed to Trooper Robinson.  The microphone recorded sounds and conversations in Robinson's immediate vicinity.  To the extent that there is an irreconcilable conflict between the testimony of the three troopers and the contemporaneous video and audio recording, the court defers to the recording.

[3]  Ample daylight remained throughout the length of the stop.

[4]  Trooper Robinson was facing south and was "clocking" eastbound traffic.

[5]  Robinson's window was open.

vehicle strike the rumble strips and looked up to see the vehicle return to the travel lane.  At the time, the pickup truck was the only vehicle in the eastbound lanes.

Accordingly, at approximately 18:35, Trooper Robinson pulled out and executed a traffic stop of the vehicle at mile marker 86.  While effecting the stop, Trooper Robinson believed that the truck again strayed out of the lane and crossed the fog line.

At 1:04 on the video,[6] Trooper Robinson approached the side of the vehicle and motioned for the driver, Jose Vicuna, to exit the vehicle.  Robinson and Vicuna walked behind the truck and stood between Robinson's unit and the truck.  Vicuna handed Robinson his driver's license, which was issued by the State of Texas.  Robinson advised Vicuna that he had gone off the road, and asked him whether everything was okay and whether he was tired.  On the video, Vicuna initially looked rather bewildered by the questions.  However, he soon responded that he was okay and denied that he was too tired.  Robinson then inquired about Vicuna's destination, and learned that he was headed to Augusta.  Vicuna confirmed that he was traveling from Houston, and going to Augusta, Georgia.  In response to additional questioning, Vicuna told Robinson that he was employed by an apartment company doing work on floors and other things.  At 2:35, Robinson told Vicuna that he would be right back and returned to his car.

At 3:00, Robinson radioed Trooper Linton to come help him translate.  At 3:20, Robinson radioed Trooper Hanemann and told him that he "might" need him to translate for him. Robinson testified that he called for Trooper Linton to see if he could understand Vicuna any more than he could.  He also asked Trooper Hanemann to assist because he was fluent in Spanish.  Hanemann testified that when he received Trooper Robinson's call,  he was traveling

---

[6]  Unless otherwise stated, the court's time references indicate the elapsed time from when the video began recording.  These numbers must be reduced by 30 seconds to obtain the elapsed time from when the vehicles came to a stop.

east on I-20 near Choudrant.  According to Hanemann once he told Robinson his location, Robinson told him to disregard the request.  The audio recording indicates that Robinson told Hanemann that Linton had just arrived, and that they would see if they could make "heads or tails of it."  Nonetheless, Hanemann decided to respond to Robinson's call because Robinson did not request help unless he needed it.

At 3:45, Robinson exited the car and walked past Vicuna to the driver's side of the truck. From across the truck, he asked the passenger, Rafael Vicuna-Iniguez ("Iniguez"), how he was doing and asked him if he spoke English.  At approximately 4:00, Trooper Linton entered the camera picture and engaged Vicuna.  Because the microphone was attached to Trooper Robinson, the conversation between Linton and Vicuna is mostly inaudible.  Linton appears to ask Vicuna for his driver's license by approximating a card with his hand.  Vicuna pointed in the direction of Robinson, indicating that Robinson had his identification.

At approximately 4:05, Trooper Robinson went around to the passenger side of the truck and asked Iniguez whether he had identification.  Robinson asked Iniguez where he was going. Robinson told the passenger, "you can understand me, so don't play dumb.  I know you can understand me."  Robinson then asked him where they were coming from now.  (Iniguez's responses are inaudible).  Robinson asked him again where they were going and whether it was for work.  Robinson asked Iniguez what kind of work he did.  At 4:45, Robinson ceased questioning the passenger and walked around the front of the truck.  During this period, Trooper Linton continued to question Vicuna.

At 5:00, Robinson returned to his unit.  At 5:25, Linton ceased questioning Vicuna and joined Robinson.  Linton asked Robinson whether Iniguez spoke any English.  Robinson replied that he had Trooper Hanemann coming by.  Linton related to Robinson that Vicuna had told him

4

that they were coming from Houston and going to Augusta, and that the passenger was his brother's son (nephew).  At the hearing, Linton characterized Vicuna's ability to  communicate in English as "fair to moderate."  Linton added that he was able to determine where Vicuna was coming from, where he was going to, who he had with him, and what kind of work that they did. According to Linton, Vicuna appeared to understand what he was saying.

At approximately 6:02, Robinson radioed Trooper Hanemann and told him to just go ahead and eat and that he and Linton would figure it out.  Hanemann replied that he was already en route.  Meanwhile, Trooper Linton went to the passenger side of the truck to question Iniguez. At 6:50, Linton ceased questioning the passenger and walked back to Vicuna to question him some more.

At 7:54, Linton rapped his knuckle on an air compressor or tank that was situated on top of various construction equipment and scaffolding in the bed of Vicuna's truck.  Linton then peered intently into the bed of the truck, and employed what he later stated was a knife.  *See* discussion, *infra*.  Apparently not finding anything suspicious, Linton backed away from the truck and resumed his questioning of Vicuna.

At 8:48, Linton again ceased questioning Vicuna and returned to the passenger side window of Robinson's unit (off camera).  Linton excitedly explained to Robinson that he saw a plate tack-welded to the side of the air compressor.  Linton said that he took out his knife and started prying, but that it turned out to be just an obscured serial number plate.  Linton told Robinson that Vicuna and the passenger both had the same story.  Robinson asked Linton whether Vicuna had ever been arrested before; Linton replied that Vicuna denied any prior arrests.

At 9:37, Robinson stated that he was unable to log on to "Thinkstream" because he did

5

not know his password.  At the hearing, Robinson testified that he tried to run a criminal history

check on Vicuna from his unit, but his computer was disconnected.  Robinson acknowledged that

he did not attempt to use Linton's computer to run a background check.  He also did not radio the

troop office to run a background check on Vicuna's driver's license.

Robinson told Linton that the passenger had given him his identification.  Linton asked

Robinson what the birth date was on the passenger's identification, and then went to question the

passenger.  At the hearing, Linton stated that the passenger did not speak as much English as

Vicuna, but that their stories matched.  Other than that, however, Linton stated that the passenger

just blankly stared at him.  Linton did not characterize the passenger as nervous, rather more like

"dumbfounded."

At 10:05, Robinson exited the unit, returned to Vicuna, and asked him whether he had

ever been arrested.  Vicuna tentatively denied any prior arrests.  Robinson then asked Vicuna to

show him his hands.  Vicuna held out his hands, and Robinson briefly grasped and felt Vicuna's

palms.  Robinson then asked Vicuna why he was shaking and whether he was nervous.  Vicuna

denied that he was nervous and again held his hands out unwaveringly.  Robinson then held his

own hands out, and shook them in an exaggerated fashion, whereupon Vicuna and Robinson

smiled and chuckled.[7]  Robinson then turned his attention to the bed of the pickup.

At 10:30, Robinson rapped his knuckles on the tailgate and asked Vicuna whether he

worked for a company.  At this point, Linton returned from questioning the passenger and joined

Robinson with Vicuna.  For the next 30 seconds or so, Vicuna explained in halting English and

gestures the nature of his work.  Apparently unable to comprehend Vicuna's response, Robinson

---

[7]  At the hearing, Robinson testified that Vicuna's hands were smooth and sweaty.
Vicuna's hands did not seem like laborer's hands to Robinson.

tells Linton at 11:03 that they needed to wait for Hanemann to arrive.  Linton then asked Vicuna whether he had a business card.  Vicuna returned to the truck to retrieve his business card.  He showed the card to Robinson, who then returned it to Vicuna.  Vicuna then returned to the rear of the truck and offered the card to Linton.  Linton looked over the card, nodded in approval, smiled and returned the card to Vicuna.

At 12:04, Robinson and Linton exchanged words off camera.  At 12:14, the three men are standing around, apparently waiting for Hanneman to arrive.  Robinson appeared to be holding Vicuna and Iniguez's identification cards and gestured for Vicuna to wait.  Robinson then returned to the unit.  Linton appeared to indicate to Vicuna that they were waiting for another trooper to arrive.

At 12:59, Trooper Hanemann arrived off camera.  Robinson told him, "probably ain't nothing to it, but I mean, just ask him the basic questions."  At 13:33, Trooper Hanemann began questioning Vicuna in Spanish.[8]  At 14:35, Trooper Hanemann turned around and nodded in an accepting manner to Linton.  At 14:40, Trooper Robinson asked Hanemann to query Vicuna for any prior arrests. Vicuna initially denied ever being arrested, but then confessed that he had been arrested for failure to pay child support.  At 14:56, Trooper Hanemann appeared to ask Vicuna whether he was carrying any contraband.  Vicuna denied same.  At 15:03 Hanemann appeared to ask Vicuna whether they could search the truck.  Vicuna assented and gestured toward the truck.  Hanemann testified that he asked Vicuna whether he minded if they took a look inside his truck – whether he minded if they searched his truck.  Hanemann stated that Vicuna said go ahead, and

_____

[8]  Hanemann testified that although he is not an expert Spanish speaker, he is above average.

motioned toward the truck.[9]

Hanemann explained Vicuna's responses to Robinson.  Robinson said to check the air tank and the tire, and then they would "cut them loose."  At the time the consent to search was obtained, Robinson had not written a traffic ticket.  At 15:38, the troopers began to search the truck.  Trooper Robinson peered into the passenger side window and then stepped up on the truck to inspect the bed area behind the cab.  Meanwhile Trooper Linton looked into the driver's side of the pickup bed in an apparently halfhearted manner.

Trooper Hanemann returned to his unit to retrieve his density meter.  Hanemann testified that he had been trained on the density meter.  He stated that objects that do not have things secreted in them produce low readings.  On the other hand, objects that should be relatively hollow, but are not, produce higher readings. A higher reading is anything more than about 36. At 15:58, as Hanemann walked up to the truck, he again confirmed from Vicuna that he had permission to search the truck.  Trooper Hanemann first tested the density of the air compressor in the bed of the truck.  He testified that he was suspicious of the air tank because he had seen bulletins indicating that air tanks were used for concealment purposes.

At 16:22, Trooper Hanemann handed the density meter to Trooper Linton.  Trooper Linton used the meter to test the density of what was probably the spare tire on the driver's side of the pickup bed.

At 16:40, Trooper Robinson apologized to Trooper Hanemann – presumably for calling him to the scene.  At 16:45, Trooper Linton finished his density check and shook his head negatively to Trooper Robinson.  At 16:48, Trooper Hanemann rapped his knuckle on the right,

_____

[9]  At the hearing, Hanemann stated that his conversation with Vicuna proceeded "flawlessly."  Hanemann never saw Iniguez until he was later removed from the truck.

rear side of the truck bed wall and accepted the density meter from Linton.

At 16:52, Trooper Robinson peered into the rear passenger cab, and stated (apparently to Hanemann) that he saw a little white block.  Hanemann then used the density meter to test the extended cab portion of the vehicle behind the passenger door, and obtained an extremely high reading.  The reading was in the mid to high 40's which indicated to Hanemann that there was a foreign object secreted in the void behind the panel

At 17:22, Hanemann asked Iniguez to exit the truck.  With the passenger side door open, Hanemann again tested the area around the passenger side of the extended cab.  At approximately 18:30, Hanemann again questioned Vicuna.  Trooper Linton stuck his arm in the void, and indicated that he felt something.  Linton told Robinson that there was a package in the wall.  At 20:13, the troopers handcuffed Vicuna and Iniguez.  The troopers then endeavored to excise the contraband from its hiding place.  At 24:18, Trooper Linton stated that there were at least three packages up in the wall.  Hanemann testified that they uncovered several kilo-sized packages and some sanding blocks used to prepare drywall.  Less than 30 seconds later, they confirmed that the packages contained cocaine.

On the recording, the troopers can be heard rejoicing over their drug bust.  A voice that sounded like Trooper Hanemann's stated that he had told himself "let me just check this one more piece."  He added "we were just about to leave . . . let me just check this one more thing." The recording ends at 25:52.

## Law and Analysis

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., Amend. IV.  "A person is seized by the police and thus entitled to

challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citations and internal quotation marks omitted). A traffic stop entails a seizure for purposes of the Fourth Amendment. *Id*.; *see also, United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (stopping a vehicle and detaining its occupant(s) constitutes a seizure). Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops. *Brigham, supra*. (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968)). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances-the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)).

A *Terry* analysis is two-tiered: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in

scope to the circumstances that justified the stop.  *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).  Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted).   However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid.  *Id*.

## I.     *Terry's* First Prong

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

In this case, it is uncontroverted that Trooper Robinson stopped Vicuna because he strayed outside his lane of travel.  In Louisiana, a vehicle that partially leaves its lane of travel and crosses the fog line either at the center of a divided highway or on the right hand shoulder of the road provides probable cause to believe that a traffic violation for improper lane use has occurred.  *State v. Waters*, 780 So.2d 1053, 1056 (La. 2001) (citing, *State v. Inzina*, 728 So.2d 458, 466 (La. App. 2d Cir.12/9/98)).[10]  Accordingly, Robinson had probable cause initially to stop Vicuna's vehicle.

## II.    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

---

[10] *See also*, La. R. S. 32:79.

reasonably related to the circumstances that justified the stop, or to dispelling his
reasonable suspicion developed during the stop.  This is because a detention must
be temporary and last no longer than is necessary to effectuate the purpose of the
stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer

may (1) examine the driver's license and registration of the driver and vehicle, and run a

computer check to investigate whether the driver has any outstanding warrants and if the vehicle

was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about

the purpose and itinerary of their trip, including other unrelated questions.  *See generally*

*Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*,

993 F.2d at 437.  "[T]he officer's questions need not even be related to the purpose of the traffic

stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'"

*Lopez-Moreno*, 420 F.3d at 431.   Detention during these actions is reasonable under the Fourth

Amendment.

"Although an officer's inquiry may be wide-ranging, once all relevant computer checks

have come back clean, there is no more reasonable suspicion, and, as a general matter, continued

questioning thereafter unconstitutionally prolongs the detention."  *Lopez-Moreno*, 420 F.3d at

431 (citations omitted).  "[T]o continue a detention after such a point, the officer must have a

reasonable suspicion supported by articulable facts that a crime has been or is being committed."

*United States v. Santiago*, 310 F.3d 336, 342 (5ᵗʰ Cir. 2002) (citation omitted).   "[I]f additional

reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has

been fulfilled, then the detention may continue until the new reasonable suspicion has been

dispelled or confirmed."  *Lopez-Moreno*, 420 F.3d at 431 (citations omitted).  Reasonable

suspicion "exists when the detaining officer can point to specific and articulable facts that, when

12

taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631-632 (5th Cir. 2006) (citation omitted). Reasonable suspicion depends upon the "totality of the circumstances and the collective knowledge and experience of the officer or officers." *Id*.

In this case, the troopers' initial questioning of Vicuna was fully within the scope of the initial traffic stop. Furthermore, Trooper Robinson initially experienced some communication difficulties with Vicuna. Accordingly, he promptly solicited the assistance of two other troopers, one of whom was a Spanish speaking officer. An officer who experiences linguistic barriers communicating with an occupant of a vehicle during a traffic stop may briefly extend the stop pending arrival of another officer who is able to bridge the communication gap. *See United States v. Ruiz*, 412 F.3d 871, 880 (8th Cir. 2005) (10 minute detention was reasonable pending arrival of Spanish speaking officer); *United States v. Pasillas-Castanon*, 2007 WL 433391 (N. D. Okla. Feb. 5, 2007) (officer permitted to detain driver during the 5 to 10 minutes that it took for a Spanish speaking officer to arrive on scene); *United States v. $189,825.00 in U.S. Currency*, 8 F. Supp. 2d 1300, 1309 (N. D. Okla. 1998) (officer justified in detaining vehicle occupants until he obtained assistance from a Spanish-speaking officer).

Although Vicuna, by and large, was able to comprehend and respond to Robinson and Linton's questions, the video reveals that, at times, he seemed unsure of some questions. Trooper Hanemann arrived only 12 ½ minutes after the initial stop and quickly confirmed Vicuna's responses to the earlier questioning. He also obtained Vicuna's admission to a prior arrest, despite his earlier denials to Robinson and Linton when questioned in English. This suggests that either Vicuna did not understand Robinson and Linton's questioning with respect to prior arrests, or Vicuna did not wish to acknowledge the arrest because of the perceived difficulty of

13

explaining in English an arrest for failure to pay child support.  Regardless, Vicuna's new-found candor when questioned in his native tongue validated Robinson's decision to solicit bi-lingual assistance.  The court further observes that Vicuna has employed the assistance of an interpreter during these court proceedings. At the end of his brief questioning, Trooper Hanemann asked for, and received Vicuna's consent to search the truck.

The undersigned further finds that the troopers developed reasonable suspicion to extend the stop.  Trooper Robinson testified that while speaking to Iniguez, he observed loosened molding on the passenger side of the extended cab, tool marks, and that the molding was not flush.  If credited,[11] this observation alone would suffice to create a reasonable belief that the truck contained a false compartment and therefore, a reasonable suspicion that the truck, even an aged truck, contained contraband.  *Estrada, supra* (citing *United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir.1994)).

The foregoing notwithstanding, Trooper Robinson noted that Vicuna appeared nervous, and that his hands were shaking, sweaty, and too smooth for a supposed laborer.  Robinson further remarked that although Vicuna faced him when speaking, he did not look him in the eye. Robinson also found it suspicious that the truck's spare tire was in the bed of the truck rather than properly stowed beneath the truck.  Trooper Hanemann testified that he was suspicious of

---

[11]  The video recording raises some doubt as to whether loose or tooled molding was a motivating consideration in Trooper Robinson's decision to extend the traffic stop.  When Hanemann arrived, Robinson told him that there was probably nothing to it, and to just ask the basic questions.  Even after Hanemann questioned Vicuna, Robinson said to check the air tank and the tire, and then they would "cut them loose."  Certainly if the troopers harbored reasonable suspicions about a hidden compartment in the extended cab, it stands to reason that this would have been one of the initial areas that they checked on the truck.  Instead, the recording suggests that Hanemann fortuitously stumbled upon the hidden compartment during one last density check before he concluded his search.  This discrepancy remained unaddressed at the hearing.

14

the air tank in Vicuna's truck because he had seen bulletins indicating that air tanks were used for concealment purposes.[12]  Finally, although not articulated by the troopers, the court notes that Vicuna was traveling along I-20, a known drug corridor.  *United States v. Jenson*, 462 F.3d 399, 405-406 (5th Cir. 2006).

While to the untrained eye, the video does not necessarily support excessive nervousness or hand trembling by Vicuna, as reported by Robinson, the court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 751 (2002) (citations omitted). Furthermore, the courts are generally obliged to accord deference and even "great respect" to an officer's training and experience.  *See Jenson*, 462 F.3d at 405.  Even if the facts articulated by the officer are individually consistent with innocent travel, taken together they may amount to reasonable suspicion.  *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1587 (citations omitted).

Here, the troopers were confronted with a self-professed laborer, who did not have the calloused hands of a manual worker, who was transporting an air tank and an out of place spare tire along a known drug corridor.  The cumulative effect of these observations provided the troopers with reasonable suspicion, sufficient to extend the stop.  *See United States v. Sierra*, 294 Fed. Appx. 884 (5th Cir. Sept. 30, 2008) (unpubl.) (nervousness, plus maps of drug trafficking towns not on driver's expressed itinerary created reasonable suspicion of criminal activity).[13]

---

[12]  The air tank had earlier aroused Linton's suspicions.  Robinson also remained interested in the tank because that was one of the two items he directed Hanemann to test with the density meter.

[13]  In the typical traffic stop, the officer is permitted to essentially question the occupants to his heart's content, until the computer background check returns a negative result.  *See Brigham, supra*.  In this case, however, the troopers never ran a background check.  The video

III.    **Consent to Search**

Because the troopers developed reasonable suspicion to extend the stop, Vicuna's consent to search the truck, obtained at the conclusion of Hanemann's questioning, was not unconstitutionally tainted.  *Estrada*, 459 F.3d at 633.  Accordingly the government's burden to prove consent is not as great as if there had been an antecedent Fourth Amendment violation.  *Id.* (citation omitted).  Under these circumstances, the court need not determine whether Vicuna's consent to search the truck was an "independent act of free will."  *Sierra*, 294 Fed. Appx. at 890, n3 (citation omitted).

It is manifest that a valid consent to search must be "free and voluntary."  *Shabazz*, 993 F.2d at 438 (citation omitted).  The government typically carries the burden of proving voluntary consent by a preponderance of the evidence.  *Id*.  "The voluntariness of consent is a question of fact to be determined on the totality of the circumstances."  *Id.*  To determine whether consent to search was obtained voluntarily, the courts consider the following factors, (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police tactics; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education level and intelligence; and (6) his belief that no incriminating evidence will be found.  *Id.*  Although all six factors are relevant, no single factor is dispositive. *Id.*

Applying the foregoing considerations here, the court finds that at the time of the consent, there is no evidence that the troopers had returned Vicuna's driver's license or otherwise told him

_____

suggests that Trooper Robinson abandoned the effort to run a computer check when he exited his car at the 10:05 mark, prior to checking Vicuna's hands.  Nevertheless, Robinson was still awaiting the arrival of a Spanish speaking officer and was permitted to continue his questioning in the interim.

that he was free to go. Accordingly, this factor is construed against the government. *Jenson*, 462 F.3d at 407, n9 (citation omitted). Second, although there were multiple police officers at the scene who repeatedly questioned Vicuna, the officers were not overbearing and remained cordial. Moreover, Vicuna fully cooperated with the officers and dutifully endeavored to address all of their concerns. There is no evidence that Vicuna was aware of his right to refuse to consent.[14] No evidence was adduced regarding Vicuna's education and intelligence. Finally, because the illicit drugs were so well hidden, Vicuna likely did not believe that they would be discovered.

Upon consideration of the totality of the circumstances, the undersigned finds that Vicuna's consent was voluntary. Once the density meter confirmed the presence of a hidden compartment in the extended cab, this discovery provided probable cause to conduct a warrantless search of the truck, both onsite and at the troop headquarters. *Estrada, supra*.[15]

### Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 21] filed by defendant Jose Luis Vicuna be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or

---

[14] The troopers did not offer Vicuna a copy of the consent to search forms (including a Spanish version) that they keep in their units.

[15] In support of his motion to suppress, Vicuna further contends that the state police unreasonably extended the stop in violation of Louisiana Code of Criminal Procedure Article 215.1(D). However, plaintiff has not demonstrated that the protection accorded by this state law is any greater than the protection afforded under the Fourth Amendment.

response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 22nd day of February 2010.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE